IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UMB BANK, N.A., )
)
Plaintiff, )
v. )                    No. 21-00832-CV-W-BP
)
JESSIE BENTON, et al., )
)
Defendants. )

## ORDER GRANTING MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Pending is Defendants' Motion to Dismiss for Failure to State a Claim.  (Doc. 33.)  For
the following reasons, the motion is **GRANTED**.

## I.  BACKGROUND

According to the Amended Complaint, which is the operative pleading in this case,
Plaintiff UMB Bank, N.A. ("UMB") is a bank headquartered in Kansas City.  (Doc. 25, ¶ 4.)
Defendant Jessie Benton ("Jessie") is the daughter of the famous artist Thomas Hart Benton
("THB"), and Defendants Anthony Gude, Daria Lyman, and Cybele McCormick are Jessie's
children.  (*Id*. at ¶¶ 2–5, 11, 22.)  THB and his wife died in the 1970s, leaving behind a trust (the
"Trust"),[1] with Jessie and her heirs as beneficiaries.  (*Id*. at ¶ 13.)  Between 1979 and 1999, the
Trust was jointly administrated by THB's friend, Lyman Field, and UMB; UMB became the sole
trustee upon Field's death in 1999.  (*Id*. at ¶ 12, 19.)  This case arises from a dispute between
Jessie and her children (collectively, "Jessie and Heirs") and UMB concerning the administration
of the Trust.

_____

[1] Originally, there were two trusts, one of which was for the benefit of THB's other child, T.P. Benton; upon T.P.'s
death in 2010, the trusts merged and Jessie and her children became the only beneficiaries.  (Doc. 25, ¶ 17.)

Upon THB's death, his estate consisted of various forms of property; a significant portion of the estate's value took the form of artwork by THB.  (*Id*. at ¶ 21.)  Since the Trust was established, UMB has periodically sold art pieces and worked to diversify the Trust's investment portfolio.  (*Id*. at ¶ 23.)

According to the Amended Complaint, Jessie and Heirs are members of a "communal family" called the "Lyman Family," which currently consists of approximately 40 adults.  (*Id*. at ¶ 44.)[2]  The Lyman Family operates a home remodeling and construction company called Fort Hill out of California, which also holds most of the family's capital as communal property.  (*Id*. at ¶ 58.)  In addition to income from Fort Hill, members of the Lyman Family rely in part on distributions from the Trust.  (*Id*. at ¶¶ 63.)

The Amended Complaint alleges that the financial needs of the Lyman Family have come to surpass the income from the Trust and Fort Hill.  (*Id*. at ¶ 66.)  As a result, Jessie and Heirs allegedly hatched a scheme to force UMB to either liquidate many of the Trust's assets for additional distributions, or, if UMB was unwilling to do so, replace UMB with a more pliant trustee.  (*Id*. at ¶¶ 68–72.)

Beginning in 2014, Jessie and Heirs transmitted communications via mail, e-mail, and text messages to one of their attorneys, Andre Boyda, asking that Boyda collect records from UMB regarding its actions as trustee.  (Doc. 25, ¶ 149.)  Boyda did so, and from the records he collected, Jessie and Heirs assembled a list of grievances with UMB's actions as trustee.  (*Id*.)  Jessie and Heirs then worked in concert with their attorneys to develop a list of talking points for the media related to UMB's alleged mismanagement of the trust, as well as the basis for a

---

[2] The Lyman family patriarch was musician Mel Lyman; the family bears no relation to Lyman Field.

lawsuit to oust UMB as trustee. (*Id.*) Jessie also communicated with news outlets, including the Wall Street Journal, regarding her concerns with UMB's management of the Trust. (*Id.*) Thereafter, Boyda made further statements to the media regarding UMB's alleged mismanagement. (*Id.*)

In December 2019, Jessie and Heirs, through their attorneys, brought suit in Missouri state court—specifically, Jackson County Probate Court—against UMB (the "Probate Case"). (*See* Doc. 25-8.) The Probate Case Petition alleges that UMB failed to maintain proper records of Trust property, (*id.* at ¶¶ 71–86); sold pieces of THB's art without obtaining reasonable appraisals of the pieces' value, resulting in sales below the pieces' market value (*id.* at ¶¶ 88–100); engaged in improper self-dealing, (*id.* at ¶¶ 109–18); failed to take reasonable measures to preserve the art pieces, (*id.* at ¶¶ 125–33); failed to maximize Trust revenue through copyrighting and licensing artwork, (*id.* at ¶¶ 135–37); and failed to prudently invest trust assets. (*Id.* at ¶¶ 147–50.)[3] UMB resigned as trustee, and was subsequently replaced by another trustee selected by Jessie and Heirs. (*Id.* at ¶ 20.) However, the Probate Case remains ongoing.

In the Amended Complaint in this case, UMB claims that (1) all of the allegations related to its management of the Trust, including those passed among Jessie and Heirs and their attorneys, those included in the Probate Case, and those disclosed to the media, are false; (2) all of the individuals who made or endorsed those allegations knew they were false; and (3) Jessie and Heirs failed to correct those allegations when other individuals made or repeated them, despite knowing that the allegations were false. (*See* Doc. 25, ¶¶ 82, 83–85, 100–04, 121–24,

_____

[3] In October 2021, Jessie and Heirs filed an Amended Petition in the Probate Case. (Doc. 36-1.) The differences between the Original and Amended Petitions are not material; the Amended Petition omits a few allegedly false claims from the Original Petition, but is otherwise substantially similar. (Doc. 25, ¶ 144.)

135–36, 149–51.)  These accusations damaged UMB in several ways; the Amended Complaint alleges that UMB lost profits by being "forced" to resign as trustee, and suffered damage to its reputation and goodwill.  (*Id*. at ¶¶ 156–58.)  The reason for UMB's resignation as trustee is not clear from the Amended Complaint, which alleges merely that it was "compelled to resign in 2021."  (*Id*. at ¶ 20.)  However, the docket of the Probate Case reveals that UMB filed a voluntary "resignation" of its position as trustee in March 2021, in which it stated that "UMB wishes to resign as [] Trustee."  (Doc. 54-1, p. 1; *see also* Probate Case document filed March 3, 2021.)[4]

In November 2021, UMB brought this case, alleging that Jessie and Heirs, together with the Lyman Family, violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, by formulating and disseminating false allegations about UMB's actions as trustee.[5]  (Doc. 1.) The Amended Complaint advances four Counts against Jessie and Heirs:

- Count I alleges that Jessie and Heirs violated RICO by committing mail and wire fraud;

- Count II alleges that Jessie and Heirs violated RICO by committing bank fraud;

- Count III alleges that Jessie and Heirs committed a conspiracy to violate RICO; and

- Count IV alleges that Jessie and Heirs engaged in a civil conspiracy to defraud UMB under state law.

(Doc. 25.)

---

[4] The Court can take judicial notice of public records, including court records, and can consider them when assessing a motion to dismiss. *E.g., Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).

[5] There are several other federal cases filed by UMB related to the Probate Case and UMB's allegations against Jessie and Heirs.  UMB first tried to remove the Probate Case to this Court in June 2021; however, the Court (The Honorable Brian C. Wimes) remanded the case because UMB's notice of removal was untimely, and there was no basis for federal jurisdiction.  (Case No. 21-0432, Doc. 43.)  Next, UMB filed a separate suit in this Court seeking a

4

Jessie and Heirs have now filed three motions regarding the Amended Complaint: a motion to dismiss for lack of jurisdiction, a motion to strike, and a motion to dismiss for failure to state a claim. Defendants oppose the motions. For the reasons discussed below, the Court finds that the Amended Complaint fails to state a claim.[6]

## II. DISCUSSION

Defendants bring their Motion to Dismiss for Failure to State a Claim under Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) entitles a party to dismissal if the opposing party has failed to state a claim upon which relief can be granted. When considering a motion under Rule 12(b)(6), the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the Plaintiff." *Stodghill v. Wellston School Dist.*, 512 F.3d 472, 476 (8th Cir. 2008).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . . The

---

declaratory judgment that the allegations in the Probate Case were false; the Court (The Honorable Stephen R. Bough) stayed the case in light of the parallel state proceeding. (Case No. 21-0710, Doc. 13.)

[6] The Court offers a few observations on Defendants' other motions. Defendants' Motion to Dismiss for Lack of Jurisdiction, (Doc. 32), argues that the Court should either dismiss or stay the case under the *Colorado River* doctrine, which permits a court to decline jurisdiction "over cases where 'parallel' state court litigation is pending." (Doc. 32, p. 7 (quoting *Spectra Commc'ns Grp., LLC v. City of Cameron, Mo.*, 806 F.3d 1113, 1121 (8th Cir. 2015)).) But abstention under *Colorado River* is discretionary, and requires considering a variety of prudential factors, *see Spectra*, 806 F.3d at 1121; in light of the Court's conclusion that UMB has failed to state a claim, the Court finds that staying the case or dismissing it without prejudice for lack of jurisdiction would not serve any interest in avoiding piecemeal litigation or promoting judicial efficiency. Consequently, (Doc. 32) is **DENIED** as moot. Defendants' Motion to Strike, (Doc. 27), argues that the Amended Complaint contains needlessly inflammatory, entirely irrelevant allegations. The Court is sympathetic to this argument. The Amended Complaint begins with a description of an unrelated armed bank robbery (which led to murder) committed by members of the Lyman Family in 1973. (Doc. 25, pp. 1–2.) The Amended Complaint continues "[Jessie and Heirs] have set their sights on a bank, plaintiff UMB. Instead of guns, Defendants now employ different means: a scheme to defraud UMB of over $300 million dollars." (*Id*. at p. 2.) Any crimes committed by the Lyman Family in the 1970s are, obviously, wholly immaterial to the facts of this case. The Court is also inclined to agree with Defendants that the implied association between themselves and bank-robbing murderers is offensive. However, in light of the dismissal of the case, the Court need not address whether this is grounds to strike the Amended Complaint, and (Doc. 27) is **DENIED** as moot. Finally, Defendants' motion to expedite briefing on their motion to strike, (Doc. 28), is **DENIED** as moot.

> plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted). A claim is facially plausible if it allows the reasonable inference that the defendant is liable for the conduct alleged. *E.g.*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Horras v. American Capital Strategies, Ltd.*, 729 F.3d 798, 801 (8th Cir. 2013). Moreover, to the extent the claims of a complaint sound in fraud—as do UMB's claims in this case—those claims are subject to a heightened pleading standard under FED. R. CIV. P. 9(b): the complaint must "plead the who, what, when, where, and how [of the fraud]: the first paragraph of any newspaper story." *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011) (citation omitted).

Because UMB asserts its first three counts under RICO, the Court begins its analysis by setting out the elements of a civil RICO claim, along with the principles courts use in assessing civil RICO claims. Generally, civil RICO does not "cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted). Specifically, 18 U.S.C. § 1962 creates a private right of action for individuals who are injured when "any person employed by or associated with any enterprise" affecting interstate commerce "conduct[s] or participate[s] . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." Thus, to prevail on a civil RICO claim, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Crest Const. II, Inc.*, 660 F.3d at 353.

Each of these elements has a specialized meaning. To qualify as an "enterprise" under civil RICO, an organization must exist under some legal framework—e.g., as a corporation or partnership—or must consist of a "union or group of individuals associated in fact although not a legal entity." *Crest Const. II, Inc.*, 660 F.3d at 354 (quoting 18 U.S.C. § 1961(4)). Individuals are "associated in fact" if they share a common purpose, participate in "an ongoing organization with members who function as a continuing unit," and possess "an ascertainable structure distinct from the . . . [alleged] racketeering." *Id.* (quoting *United States v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004)).

For conduct to qualify as a "pattern" of "racketeering activity," at least two things are required. First, the defendants must have performed multiple related "predicate acts" that RICO defines as "racketeering"; these acts are specific crimes listed in 18 U.S.C. § 1961(1) and include mail, wire, and bank fraud. Second, there must be enough "continuity" between the predicate acts to constitute a "pattern." *Crest Const. II, Inc.*, 660 F.3d at 356. Case law recognizes two types of continuity: "close-ended continuity," which requires a showing of "multiple predicate acts occurring over a substantial period of time," or "open-ended continuity," which requires that the "alleged predicate acts threaten to extend into the future." *Craig Outdoor Advertising, Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1028 (8th Cir. 2008). By contrast, "a single transaction which involves only one victim and takes place over a short period of time does not constitute the pattern of racketeering required for long-term criminal activity under a RICO claim." *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank*, 934 F.2d 976, 981 (8th Cir. 1991).

Even if a plaintiff establishes a pattern of predicate acts, the plaintiff must also allege "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp.,*

7

*LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010). "A link that is too remote, purely contingent, or indirect is insufficient." *Id.* If an alleged loss "could have [occurred] for any number of reasons unconnected to the asserted pattern of fraud," proximate cause does not exist. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006). Put differently, if an alleged set of predicate acts did not lead "'directly to the plaintiff's injuries' . . . [a plaintiff has] failed to meet RICO's 'requirement of a direct causal connection between the predicate offense and the alleged harm.'" *Hemi Grp., LLC¸* 559 U.S. at 10–11 (quoting *Anza*, 547 U.S. at 460–61).

Finally, only certain types of injuries are compensable under RICO. Specifically, a plaintiff must provide proof of "concrete financial loss, and not mere injury to a valuable intangible property interest." *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012) (citations omitted). Thus, damage to a plaintiff's reputation does not qualify as compensable harm under RICO. *Hamm v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.*, 187 F.3d 941, 954 (8th Cir. 1999).

In summary, a RICO plaintiff must adequately allege a series of predicate acts, which are coherent and longstanding enough to qualify as a "pattern," and which directly, proximately cause a compensable harm. With these principles in mind, the Court discusses the basis for UMB's RICO claims, before turning to Defendants' arguments for dismissing them. UMB alleges the following predicate acts, which it believes constitute a pattern of racketeering activity:

- Jessie and Heirs instructed their attorney to collect records about UMB's actions as trustee, file the Probate Case, and communicate with the media about their allegations, all for the purpose of ousting it from that position;

- Jessie and Heirs knowingly communicated false claims about UMB's behavior among themselves and with their attorney, including drafts of the Original and Amended Petitions in the Probate Case;

- Jessie and Defendants' attorney communicated the substance of their allegations to various press organizations in December 2019; and

- Jessie and Heirs, through their attorney, filed and continue to prosecute the Probate Case, and in doing so, knowingly advanced false allegations against UMB.

(Doc. 25, ¶¶ 149–50.) These acts, according to the Amended Complaint, were all effectuated through mail or wire communications. (*Id.* at ¶ 150.) Count I alleges that these acts constituted a pattern of racketeering activity because they were all mail or wire fraud; Count II alleges that these acts constituted a pattern of racketeering activity because they were all bank fraud; and Count III alleges that these acts constituted a conspiracy to violate civil RICO. The Court concludes that none of these theories state a claim.

### 1. Count I: Mail and Wire Fraud

#### a. <u>Alleged Predicate Acts</u>

The Amended Complaint avers that several categories of communications made by Defendants constitute mail or wire fraud, and thereby qualify as RICO predicate acts. Defendants argue that many of these allegations are simply not "predicate acts," (Doc. 41, pp. 7–9), and the Court agrees.

To use wire or mail fraud for purposes of establishing a RICO predicate act, a plaintiff must allege "(1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme." *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 406 (8th Cir. 1999). And "[t]hough mail [or wire] fraud can be a predicate act, mailings [or wire communications] are

insufficient to establish the continuity factor unless they contain misrepresentations themselves." *Id.*

As discussed above, the Amended Complaint identifies four types of communications which UMB believes constituted mail or wire fraud: (1) Jessie and Heirs' instructions to their attorney to gather information on UMB's status as trustee, file the Probate Case, and communicate with the media; (2) communications among Jessie and Heirs, and their attorney, relating to their allegations against UMB; (3) communication of those allegations to the press; and (4) communication of those allegations in the Original and Amended Petitions, and other litigation documents, in the Probate Case. (*See* Doc. 25, ¶ 150 (summarizing alleged predicate acts).) The Court discusses each category in turn.

### i. *Defendants' instructions to their attorney*

With respect to the first category of alleged predicate acts, the Court finds that it cannot constitute mail or wire fraud for a simple reason: an instruction is not a representation at all, and so when Jessie and Heirs told their attorney to look into UMB's actions as trustee, file the Probate Case, and discuss their allegations with the media, those communications could not have "contain[ed] misrepresentations." *Wisdom*, 167 F.3d at 406.

### ii. *Communications among Jessie and Heirs and their attorney*

With respect to the second category of alleged predicate acts, Defendants argue that the Amended Complaint fails to plead these communications "with particularity," (Doc. 33, p. 13), or otherwise show that they meet the elements of mail or wire fraud, and the Court agrees. The Amended Complaint alleges the following communications among Jessie and Heirs and their attorneys:

- "Defendants expressly outlined the false claims they would later make in the media and [the Probate Case] Petition";

- "By use of wire communications (e-mail), . . . Defendants . . . and some or all of Bentons' Counsel prepared a 'List of Grievances,' that, upon information and belief, included the false statements and claims made in the [Probate Case] Petition";

- "[D]efendants Benton and Gude, through wire communications (e-mail) communicated with [Boyda, their attorney] and others regarding the Thomas Hart Benton painting *Desert Artist*";

- "Boyda, through wire communications (e-mail), communicated with . . . [Jessie] regarding 'talking points' for defendant Benton and Bentons' Counsel to use in their media interviews";

- "Boyda, through wire communications (e-mail), communicated with . . . [Jessie] attaching the 'Final Version of Petition with Red Line'";

- "Boyda sent to Defendants, through wire communications (e-mail), The Wall Street Journal article based, in part, on the interview statements of [Jessie]";

(Doc. 25, ¶¶ 149–50.)

Initially, the last three of these communications cannot serve as RICO predicate acts for a simple reason: Defendants must have known that their representations about UMB were either true or false, so any communication by Boyda to Defendants cannot have exhibited an "intent to defraud," nor did these communications reach any third-party whom they could have defrauded. *Wisdom*, 167 F.3d at 406.[7]

The remaining communications, from Jessie and Heirs *to* their attorney, are also insufficient to support a RICO predicate act. Initially, the Court does not believe that communications from a client to her attorney can constitute fraud—otherwise, any criminal

---

[7] To the extent the Amended Complaint suggests that Defendants committed fraud by failing to correct misrepresentations or misapprehensions by others, the Court disagrees; "silence" or "nondisclosure of a relevant fact" is not enough to sustain a mail or wire fraud claim. *United States v. Hansmeier*, 988 F.3d 428, 436–37 (8th Cir. 2021).

defendant who said "it wasn't me" to her attorney might be liable for mail fraud. But regardless, the communications are not pled with sufficient particularity to satisfy Rule 9(b)'s requirements—that is, they do not include the "who, what, when, where, and how" of the fraud. *Summerhill,* 637 F.3d at 880 (8th Cir. 2011). The assertion that Defendants "outlined the false claims they would later make" does not explain the nature of those claims, which Defendants "outlined" them, or whether and how the outliner(s) knew the claims were false. The assertion that Defendants prepared a "list of grievances" similarly does not explain which Defendants prepared the list, what the "grievances" were, or whether and how the preparer(s) of the list knew the grievances were false (assuming a "grievance" is susceptible to being true or false). Finally, the assertion that Defendants communicated with their lawyer about the *Desert Artist* painting— which was later the basis of an allegedly false claim in the Probate Case—does not explain the contents of those communications, including whether the communications contained *any* factual representations, nor how Defendants knew any such representations were false.[8]

   *iii. Communications between Jessie and Heirs or their attorney and the media*

   With respect to the third category of alleged predicate acts, the Amended Complaint alleges that Jessie was interviewed by the Wall Street Journal via telephone on December 14 and 15, and made fraudulent statements in that interview. (Doc. 25, ¶ 150.) It also alleges that around the same time, Boyda gave false statements to reporters from the Kansas City Star and KCUR with Defendants' authorization, and that all three media entities repeated those claims in various stories and reports. (*Id.*)

---

[8] These are also independent reasons why the alleged communications from Boyda to Defendants do not qualify as predicate acts.

The Court was initially unsure whether making false statements to the press could qualify as an act of wire or mail fraud, given that several courts have rejected efforts to "shoehorn a defamation claim into the RICO framework." *E.g., Center for Immigration Studies v. Cohen*, 410 F. Supp. 3d 183, 191 (D.D.C. 2019). The Court also became aware of certain criminal cases interpreting the mail and wire fraud, which suggested that to commit mail or wire fraud, the "purpose [of the alleged misrepresentation]" must be to "get someone else to act on it." *E.g., United States v. Hansmeier*, 988 F.3d 428, 436 (8th Cir. 2021). The Court therefore requested supplemental briefing from the parties to address, among other issues, whether a false statement to the press exhibits the "intent to defraud" required for wire and mail fraud claims. (Doc. 52.)[9]

In UMB's supplemental brief, it explained that (1) it is not attempting to assert a defamation claim, and (2) unlike criminal mail and wire fraud, to qualify as a predicate act under RICO, a plaintiff need not allege "first-party reliance" on the purported misrepresentation. (Doc. 53, pp. 6–7.) To support this position, UMB cites *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), where the Supreme Court explicitly rejected a "first-party reliance" requirement. In Defendants' response, they generally assert that regardless of the elements of mail or wire fraud, the Amended Complaint fails to allege the fraudulent conduct with sufficient particularity—and specifically, fails to aver "intent to deceive" in a sufficiently concrete fashion. (Doc. 54, pp. 7–8.)

After considering the parties' submissions, the Court agrees with UMB that Defendants' communications with the media in late 2019 *could* constitute mail or wire fraud. While mere

---

[9] The Court also requested supplemental briefing on whether the Amended Complaint adequately alleges a proximate causal connection between Defendants' communications with the press and the harm UMB allegedly suffered; that issue will be addressed later in this Order.

defamation is not a RICO predicate act, the fact that conduct is defamatory also does not *preclude* it from qualifying as a RICO predicate act, and there is at least some case law suggesting that false statements to the media can trigger RICO liability. *E.g., United States v. Harkonen*, 510 Fed. App'x 633, 638 (9th Cir. 2013) ("[I]f [the defendant] made misleading statements in a press release with the specific intent to defraud he would be subject to the wire fraud statute."). The Court also disagrees with Defendants' argument that the Amended Complaint fails to allege the misrepresentations and intent to deceive with sufficient particularity. The Amended Complaint includes the Wall Street Journal article as an exhibit, (Doc. 25-14), so the alleged misrepresentations are clear; moreover, assuming Jessie's statements in the interview were false, a reasonable factfinder could conclude that she intended to deceive the interviewer or the public by making them. In sum, the Court concludes that Jessie's interview with the Wall Street Journal and Boyda's communications to reporters from the Kansas City Star and KCUR might qualify as predicate acts of mail or wire fraud.[10]

> *iv.  Communications made in the course of prosecuting the Probate Case*

With respect to the fourth category of alleged predicate acts, Defendants assert that any communications that they made in the course of prosecuting the Probate Case cannot form the basis for RICO predicate acts. (Doc. 33, pp. 14–16.) In making this argument, Defendants rely on several related, but distinct legal concepts: they contend that Missouri's "litigation privilege" renders them immune from liability for initiating and prosecuting a lawsuit, and that alleged perjury is simply not a predicate act. (*Id.*) UMB responds that the "litigation privilege" does not

---

[10] The Amended Complaint also references other news organizations which "picked up" the story from these three interviews in December 2019. (*E.g.,* Doc. 25, p. 41.) Obviously, these independent media outlets are not agents of

14

apply to federal RICO claims, and that the Amended Complaint does not allege perjury. (Doc. 37, pp. 17–18.)

The Court finds that regardless of whether Missouri's litigation privilege applies, there is a robust consensus among federal courts that "serving litigation documents by mail [or wire] can[not] constitute [] fraud" for purposes of establishing a RICO predicate act. *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 2010 WL 5129288, at *7 (W.D. Mo. Nov. 22, 2010) (quoting *United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002)); *see also Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) ("[A]llegations of frivolous, fraudulent, or baseless litigation activities . . . cannot constitute a RICO predicate act."); *Snow Ingredients, Incorporated v. SnoWizard, Incorporated*, 833 F.3d 512, 525 (5th Cir. 2016) (holding that "bad faith litigation" cannot serve as a RICO predicate act); *Gabovitch v. Shear*, 70 F.3d 1252, 1995 WL 697319, at *3 (1st Cir. 1995) (rejecting a civil RICO claim where "simply by alleging that defendants' litigation stance in the state court case was 'fraudulent,' plaintiff is insisting upon a right to relitigate that entire case in federal court (while the case remains pending in the state [] court)").

There are sound policy reasons for this consensus: if filing litigation documents could form the basis for a RICO action, "every unsuccessful lawsuit could spawn a retaliatory action," which would "inundate the federal courts with procedurally complex RICO pleadings," "engender wasteful satellite litigation," and spawn "ad infinitum litigation with each party claiming that the opponent's previous action was malicious and meritless," *Kim*, 888 F.3d at 104 (citations omitted; cleaned up); *see also Paul S. Mullin & Assocs. v. Bassett,* 632 F. Supp. 532,

---

Defendants, and so their behavior is not a predicate act attributable to Defendants. *E.g., Craig Outdoor Advertising,*

540 (D. Del. 1986) ("The Court finds absurd plaintiffs' apparent suggestion that a lawyer's act in

posting a letter which states a client's legal position in a dispute can constitute mail fraud. If such

were the situation, every dispute in which the parties' counsel exchanged letters could give rise

to RICO litigation. Such activity simply is not fraudulent."); *Nolan v. Galaxy Scientific Corp.*,

269 F.Supp.2d 635, 643 (E.D. Pa. 2003) ("This court is unwilling to expand RICO liability for

mail fraud in such a dramatic fashion as to include litigation papers and pre-litigation statements

of legal position.").   Therefore, the Court joins the vast majority of other federal courts in

holding that Defendants' litigation papers—including the Original and Amended Petitions in the

Probate Case—are not RICO predicate acts.

### b. Pattern of Racketeering

Based on the above discussion, the Court concludes that the Amended Complaint

adequately alleges at most three predicate acts: that Defendants engaged in wire fraud by making

false allegations about UMB to three media outlets in December 2019.  (*See* Doc. 25, ¶ 99.)  As

discussed above, a RICO plaintiff must allege a *pattern* of racketeering activity, which "is shown

through two or more related acts of racketeering activity that amount to or pose a threat of

continued criminal activity."  *Craig Const. II, Inc.*, 660 F.3d at 356 (citation omitted; cleaned

up).  "Closed-ended continuity involves a series of related predicates extending over a substantial

period of time; open-ended continuity involves acts which, by their nature, threaten repetition

into the future."  *Id*. (citation omitted).  Consequently, "[a] single transaction which involves

only one victim and takes place over a short period of time does not constitute the pattern of

_____

*Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008).

racketeering required for long-term criminal activity under a RICO claim." *Id*. at 358 (citation omitted).

As Defendants point out, UMB alleges that it—and it alone—was the victim of a single scheme, orchestrated by a single set of perpetrators, designed with the sole goal of ousting it as a trustee on a single trust of which Defendants were the beneficiaries. (Doc. 33, pp. 8–9.) Moreover, all of the conduct by Defendants which allegedly injured UMB—the filing of the Probate Case and the publication of the interviews with Boyda and Jessie—occurred over the course of a few months between December 2019 and February 2020. (*See* Doc. 25, ¶ 150.) These allegations are insufficient to establish close- or open-ended continuity.

To establish close-ended continuity requires "a series of related predicates extending over a substantial period of time. Predicate acts over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 823 (8th Cir. 2015) (quoting *H.J. Inc.*, 429 U.S. at 242). Instead, close-ended continuity requires "related acts continuing over a period of time lasting at least one year." *Stonebridge Collection, Inc.*, 791 F.3d at 823 (quoting *United States v. Hively*, 437 F.3d 752, 761 (8th Cir. 2006)). Here, all of the viably alleged predicate acts—Jessie and her attorney's communications with the media—occurred over the course of a few weeks, and certainly "threaten[] no future criminal conduct."

To establish open-ended continuity, a plaintiff must allege that "the predicate acts themselves involve a distinct threat of long-term racketeering activity or that the predicate acts constitute a regular way of conducting an ongoing legitimate business or RICO enterprise." *Craig Outdoor Advertising*, 528 F.3d at 1028 (citing *H.J. Inc. v. Northwestern Bell Telephone*

*Co.*, 492 U.S. 229, 242–43 (1989)). Here, UMB has alleged no "distinct threat of long-term racketeering activity," because the alleged predicate acts—fraudulent communications with the media at the outset of a lawsuit—occurred in a discrete timeframe, and pertained to a specific, non-replicable event: the filing of the Probate Case. Moreover, there are no allegations suggesting that fraudulent communications with the media "constitute a regular way of conducting an ongoing . . . RICO enterprise"—that is, there is nothing in the Amended Complaint to indicate that the Lyman family routinely disseminates fraudulent statements to news outlets.

In sum, the Amended Complaint does not allege "closed-ended" continuity, because the predicate acts did not occur over a sufficient period of time; it also does not allege "open-ended" continuity, because there is nothing from which to conclude a threat of future racketeering activity. For these reasons, the Amended Complaint does not allege a "pattern" of racketeering activity.

      c.  <u>Proximate Cause</u>

Even if the Court found that UMB had adequately alleged a pattern of racketeering activity, it would also conclude that there is no proximate causal connection between that pattern and any compensable harm suffered by UMB. The Amended Complaint alleges the following forms of damage: "[i]njury to UMB's business profits by being forced to relinquish its position as trustee"; "[i]njury to UMB's goodwill" with customers and the public; and UMB's losses and expenses arising from the Probate Case. (Doc. 25, p. 55.)

The second and third categories are easily disposed of. RICO requires that a plaintiff allege a "concrete financial loss," *Gomez*, 676 F.3d at 660, meaning that reputational damage—

including damage to UMB's "goodwill"—does not qualify. *Hamm*, 187 F.3d at 954. Moreover, the cause of any damage to UMB resulting from the Probate Case will be Defendants' alleged misrepresentations in that case, and as discussed above, those are not predicate acts.

That leaves the first category of damage: injury to UMB's profits resulting from "being forced to relinquish its position as trustee." This is a "concrete financial loss"—UMB had the expectation of earning fees and profits from its administration of the Trust, but can no longer earn that money because it is no longer trustee. The Court was unsure, however, whether the Amended Complaint adequately alleged a proximate causal connection between (1) Defendants' allegedly false statements to the media and (2) UMB's loss of its position as trustee, and therefore ordered the parties to submit supplemental briefs on that issue. (Doc. 52.)

In its supplemental brief, UMB explained that Defendants' allegedly false statements to the media "pressure[d] UMB to relinquish its position as trustee of the Trust," and argues that this constitutes sufficient "allegations of 'some direct relation' between Defendants'" alleged misrepresentations to the media and UMB's concrete financial loss. (Doc. 53, p. 10.) The Court disagrees. UMB *voluntarily* resigned as trustee; the stated reason on its resignation is that it "wishes to resign." (Doc. 54-1.) Moreover, UMB resigned as trustee on February 26, 2021, more than a year after any of the allegedly false statements to the media. (*Id*.) The Amended Complaint simply does not allege *any* "direct relation" between the false statements to the media and UMB's resignation, and indeed, the allegations suggest that the resignation "could have [occurred] for any number of reasons unconnected to" the alleged misrepresentations to the media, *Anza*, 547 U.S. at 458 (2006), including the proceedings in the Probate Case and a desire to minimize potential liability in that case, or a loss of trust and collegiality between UMB and

19

Defendants. UMB's suggestion that "pressure" from the alleged misrepresentations from the media "forced" it to resign as Trustee more than a year after those misrepresentations were published is belied by the Record, and regardless, is "too remote, purely contingent, or indirect" to establish proximate cause. *Hemi Grp.*, 559 U.S. at 9. Therefore, the Court finds that there is no proximate causal connection between the viable predicate acts in the Amended Complaint and the compensable form of damage UMB has alleged. For these reasons, Defendants' Motion to Dismiss is **GRANTED** with respect to Count I.

### 2. Count II: Bank Fraud

Count II alleges that Defendants committed a pattern of racketeering through bank fraud. "To commit bank fraud, a person must 'execute[ ], or attempt[ ] to execute, a scheme or artifice' either '(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.'" *H&Q Properties, Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (quoting 18 U.S.C. § 1344) (alterations in original). Moreover, the scheme must "have some real connection to a federally insured bank, and thus implicate [a] federal interest"; a plaintiff cannot prevail simply by alleging that it is a bank and has been the victim of fraud if that fraud is "only tangentially related to the banking system." *Id.* (citation omitted). And, importantly, there must be "an intent to deceive *the bank*" for an action to constitute bank fraud. *United States v. Staples*, 435 F.3d 860, 867 (8th Cir. 2006); *see also United States v. Ponec*, 163 F.3d 486, 489 (8th Cir. 1998) (to succeed in a bank fraud case, "the government needed to prove that [the defendant] deliberately made false representations *to the bank*") (emphasis added).

Case 4:21-cv-00832-BP   Document 55   Filed 06/29/22   Page 20 of 23

All of the reasons why the Amended Complaint fails to state a RICO claim discussed in the section regarding Count I also apply to Count II: the only possible predicate acts alleged are Defendants' communications with the media, which (1) do not form a pattern of racketeering and (2) did not proximately cause any compensable damage. Moreover, the alleged predicate acts also do not qualify as bank fraud for two additional reasons. First, none of the alleged misrepresentations were directed *to* UMB—they were directed to Defendants' attorney, the press and public, and the Jackson County Probate Court. Thus, the Amended Complaint fails to allege any intent to "deceive *the bank*," or any false statement made "*to the bank*," as required to properly aver bank fraud as a RICO predicate act. *Staples*, 435 F.3d at 867; *Ponec*, 163 F.3d at 489. Second, the bank fraud statute does not create "a plenary ban on fraud," nor was it intended to "federaliz[e] funds" that have nothing to do with the banking system. *Loughrin v. United States*, 573 U.S. 351, 362 (2014). Here, while UMB is a bank, the alleged fraud had nothing to do with UMB's status *as a bank*—rather, the fraud concerned UMB's position *as a trustee*, a position that could have just as easily been occupied by a non-bank person or entity, and that has nothing to do with the banking system. For these reasons, Defendants' Motion to Dismiss is **GRANTED** with respect to Count II.

### 3. Count III: RICO Conspiracy

For the reasons discussed above, the Court finds that the Amended Complaint fails to adequately allege a RICO violation under Counts I and II. Count III alleges that Defendants *conspired* to violate RICO under 18 U.S.C. § 1962(d). However, to successfully allege a RICO conspiracy claim, "the plaintiff[] must *not only* [allege] the elements of a RICO violation but also that [the defendant] objectively manifested an agreement to participate in" an enterprise's

violation of RICO. *Rosemann v. St. Louis Bank*, 858 F.3d 488, 500 (8th Cir. 2017) (citation omitted; cleaned up). Because the Amended Complaint fails to allege the elements of a RICO violation, it also fails to allege a RICO conspiracy; therefore, Defendants' Motion to Dismiss is **GRANTED** with respect to Count III.

### 4. Count IV: State-Law Conspiracy

The Amended Complaint asserts that the Court has jurisdiction over the RICO claims, Counts I–III, under 28 U.S.C. § 1331, because those claims arise under federal law. (Doc. 25, ¶ 6.) The Court can also exercise supplemental jurisdiction over Count IV, a state law civil conspiracy claim, because that claim arises from the same common nucleus of operative facts as the RICO claims. *See* 28 U.S.C. § 1367(a).[11]

However, the Court "may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "The factors a court should consider in determining whether to exercise jurisdiction over pendent state law claims are judicial economy, convenience, fairness, and comity." *Wilson v. Miller*, 821 F.3d 963, 970 (8th Cir. 2016). This "balance of factors . . . will [usually] point toward declining to exercise jurisdiction over the remaining state-law claims" when "all federal-law claims are eliminated before trial." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Here, the Court has determined that all of the RICO Counts in the Amended Complaint fail to state a claim, well in advance of trial. The Court therefore declines to exercise supplemental jurisdiction over the state civil conspiracy claim, so Count IV is **DISMISSED WITHOUT PREJUDICE**.

### III.  CONCLUSION

In its opposition to Defendants' motion to dismiss, UMB insists that its claims "are not malicious prosecution claims." (Doc. 37, p. 10.) Yet, at bottom, that is precisely what they are: UMB believes that Defendants have made false allegations in the Probate Case and related communications with the media, and while that behavior might very well give rise to a viable malicious prosecution or abuse of process claim (or perhaps even a defamation claim), it does not constitute racketeering. *E.g., Curtis & Associates, P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 171 (E.D.N.Y. 2010) ("[A]lthough plaintiffs have styled their allegations as mail and wire fraud, plaintiffs' allegations in fact focus entirely upon the 'litigation activities' involved in defendants' allegedly 'phony' and 'frivolous' litigation with plaintiffs. Plaintiffs' allegations thus loosely track the elements for a malicious prosecution."). For the foregoing reasons, Counts I, II, and III are **DISMISSED** with prejudice for failure to state a claim, and Count IV is **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction.[12]

**IT IS SO ORDERED.**


/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
Date: June 29, 2022                     UNITED STATES DISTRICT COURT

---

[11] The Court notes, however, that civil conspiracy is not a separate cause of action, but a method for extending civil liability. *Western Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. 2012) (en banc).

[12] In light of this dismissal, the parties' joint motion for a protective order, (Doc. 42), is **DENIED**.

Case 4:21-cv-00832-BP   Document 55   Filed 06/29/22   Page 23 of 23